Dan Stormer, Esq. [S.B. #101967]
Barbara Enloe Hadsell, Esq. [S.B. #086021]
Brian Olney, Esq. [SB. #298089]
Tanya Sukhija-Cohen, Esq. [S.B. #295589]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bhadsell@hadsellstormer.com
        bolney@hadsellstormer.com
        tanya@hadsellstormer.com

Kristina Mazzocchi, Esq.
Ria Julien, Esq.
MIRER MAZZOCCHI & JULIEN, PLLC
1 Whitehall Street, 16th Floor
New York, NY 10004
Telephone: (212) 231-2235
Facsimile: 212-409-8338
Emails:  kmazzocchi@mmsjlaw.com
         rjulien@mmsjlaw.com

Attorneys for Plaintiff
LONNIE PATE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONNIE PATE,<br><br>                     Plaintiff,<br><br>          v.<br><br>PACIFIC HARBOR LINE, INC.;<br>ANACOSTIA RAIL HOLDINGS<br>COMPANY; GREGORY PETERS; ERIC<br>FLORES; and DOES 1-10<br>.<br><br>                     Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. Race Discrimination<br>   (42 U.S.C. § 1981)<br>2. Harassment and Hostile Work<br>   Environment (42 U.S.C. § 1981)<br>3. Retaliation (42 U.S.C. § 1981)<br><br>**DEMAND FOR JURY TRIAL** |

PLAINTIFF LONNIE PATE ("Plaintiff"), brings this action against DEFENDANTS PACIFIC HARBOR LINE, INC. ("PHL"), ANACOSTIA RAIL HOLDINGS COMPANY ("Anacostia"), GREGORY PETERS, ERIC FLORES, and DOES 1-10 (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.    Defendant PHL is a short-line railroad corporation. PHL was formed in 1998 to provide rail transportation, maintenance, rail switching,[1] and dispatching services (directing and monitoring the movement of freight trains) to and from the Ports of Long Beach and Los Angeles, which together form the largest container port in the United States. According to PHL's website as of the date of filing this Complaint, PHL has 189 employees.

2.    Anacostia is the parent company of PHL and was formed in 1997 for the purpose of owning and developing short line railroads and related transportation and logistics firms. Anacostia is the owner and manager of six subsidiary U.S. short-line freight railroads operating in seven states, including PHL. According to Anacostia's website, Anacostia and its subsidiaries together handle the equivalent of approximately 2 million train carloads per year, provide freight rail service to major metropolitan centers and other smaller communities throughout the United States, and operate more than 760 miles of track. Anacostia's services also include car switching for intermodal terminals (terminals through which goods are transported by two or more modes of transport, such as trains and ships) and various industries, track maintenance and repair, freight trans-loading and train dispatching. On information and belief, Anacostia is

---

[1] Rail switching includes (1) putting cars in a specific order, (2) placing cars for loading or retrieving empty cars, (3) adding or removing cars from a train at an intermediate point or (4) the movement of cars from one point to another within a rail yard. See "Switching", Railroad Dictionary, CSX Corporation, *available at* https://www.csx.com/index.cfm/about-us/company-overview/railroad-dictionary/?i=S (*last visited* July 25, 2021); *see also* Freight Rail and Reciprocal Switching, Association of American Railroads, *available at* https://www.aar.org/freight-rail-and-reciprocal-switching/ (*last visited* July 25, 2021).

COMPLAINT FOR DAMAGES           -1-

organized as a holding company and directly manages and controls marketing, human resources, and financial management services for and on behalf of PHL.

3.     Plaintiff Lonnie Pate is a former railroad engineer jointly employed by PHL and Anacostia (collectively the "Corporate Defendants") at the Ports of Long Beach and Los Angeles. Plaintiff had about 14 years of tenure with the Corporate Defendants. Plaintiff is black/African American.

4.     This lawsuit centers on the Corporate Defendants' decades-long discrimination including disparate treatment and impact, harassment, and creation and tolerance of a hostile work environment based on race or color, as well as retaliation for complaining of the same. Rather than taking any steps to remedy the discrimination and harassment, the Corporate Defendants by their acts and failures to act have permitted Plaintiff's co-workers and supervisors to openly act in a racially hostile manner and failed to protect black workers, including Plaintiff, from such conduct. The Corporate Defendants' management has endorsed and continues to endorse and direct discriminatory policies and practices against their black workforce, as well as retaliation against black and non-black workers those who speak out against the racism.

5.     Throughout the course of Plaintiff's employment by the Corporate Defendants, but particularly once new management came on board in about 2009, Plaintiff and other black workers have been subjected to an egregious, racially hostile work environment, because of their actual or perceived race or color as black workers, while similarly situated non-black workers receive preferential treatment. Plaintiff and other black workers have been subjected on a regular basis to "Jim Crow" type racism used by workers at all levels including members of management in an open and notorious manner, including but not limited to being called racial epithets such as "n***er"; exposed to images of nooses and Ku Klux Klan ("KKK") imagery; and demeaned by denigrating racist stereotypes of black people as "lazy".

6.     Non-black members of the Corporate Defendants' management, including Defendant Gregory Peters, PHL's Operations Support Manager, and Defendant Eric

Flores, one of PHL's Trainmasters, personally have participated in harassing conduct and the creation of a hostile work environment for black workers such as calling black workers "n***er" or "monkeys".

7.      The dwindling proportion of black workers in PHL's workforce tells the story of a railroad that across time has increasingly become utterly hostile to black labor, resulting in the Corporate Defendants' workplaces in the Ports of Los Angeles and Long Beach becoming among the most difficult and racist work environments for black industrial workers in the country. Anacostia maintains this pattern not just in PHL, its California subsidiary, but elsewhere, including in its New York subsidiary, New York and Atlantic Railway. Indeed, Defendants PHL and Anacostia have maintained an entrenched and officially sanctioned system of disparate treatment based on race.

8.      Defendants' unlawful conduct continued up through Plaintiff's termination. Many of the managers who have known, tolerated, encouraged, and even directly participated in said environment across the span of years remain in their positions.

## PARTIES

9.      Plaintiff Lonnie Pate ("Plaintiff") is a black male. He is a resident of Riverside County. Plaintiff was employed in Los Angeles County by Defendants PHL and Anacostia from about 2002 to November 21, 2016, first as a conductor and, since about 2004, as an engineer.

10.     Defendant PHL's headquarters and principal place of business are located in Los Angeles County at 705 North Henry Ford Avenue, Wilmington, California 90744. On information and belief, all or nearly all of its 189 employees work in Los Angeles County.

11.     Defendant Anacostia is the parent company of PHL. Its headquarters and principal place of business are located in Cook County at 224 South Michigan Avenue, Suite 330, Chicago, Illinois 60604.

COMPLAINT FOR DAMAGES                    -3-

12.    Defendant Gregory Peters is employed by Defendants PHL and Anacostia and on information and belief, is an Operations Support Manager, serving in a managerial or supervisory role at the ports of Long Beach and/or Los Angeles. On information and belief, he resides in the County of Los Angeles.

13.    Defendant Eric Flores is employed by Defendants PHL and Anacostia and on information and belief, is a Trainmaster, serving in a managerial or supervisory role at the ports of Long Beach and/or Los Angeles. On information and belief, he resides in the County of Los Angeles.

14.    Defendants Does 1 through 10 are sued under fictitious names. The true names and capacities of Does 1-10 are currently unknown to Plaintiff. Plaintiff will amend this Complaint or seek leave to do so when the true names and capacities of these Defendants have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the acts, omissions, injuries, and damages alleged herein.

15.    Plaintiff is informed and believes and thereon alleges that each Defendant was at all material times an agent, servant, employer, joint employer, employee, partner, joint venturer, co-conspirator, and/or alter ego of each of the other Defendants, and in doing the acts and omissions alleged, was acting within the course and scope of those relationships. Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein participated in and/or gave consent, aid, encouragement, and assistance to each of the other Defendants, and ratified and authorized the acts or omissions of each Defendant.

## JURISDICTION AND VENUE

16.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1981.

17.    Venue is proper in this Court because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

COMPLAINT FOR DAMAGES               -4-

1

**FACTUAL ALLEGATIONS**

2
**The Defendants Subjected Plaintiff To Harassment And A Racially Hostile Work**

3
**Environment.**

4
18.    Throughout the course of his employment, but particularly once new

5
management came on board in or about 2009, Plaintiff was subjected to vile and

6
discriminatory racial slurs and epithets, and unambiguous disparate treatment, directed

7
to him personally and/or utilized in his presence. Among such epithets, spoken openly

8
in the workplace and at all times tolerated, encouraged, and even participated in by

9
managers, are the following, which are examples only and not an exhaustive

10
list: "n***er", "slave", "monkey", "baboon", "gorilla", "coon", and "dummy". Plaintiff

11
was called "n***er" or heard the word used in his presence by coworkers or

12
managers—including Defendant Flores, Defendant Peters, and other non-black

13
managers—on a weekly or near weekly basis.

14
19.    The following racist conduct, which likewise is not an exhaustive list, was

15
directed to Plaintiff personally and/or utilized in his presence: threatening KKK

16
imagery and slogans such as "the only good n***er is a dead n***er"; demeaning

17
statements regarding his race such as being told that "blacks are not intelligent" or are

18
"lazy"; harassing slave "jokes"; insulting and negative racial stereotypes regarding

19
black workers' supposed love of watermelons and fried chicken; and mocking the color

20
of black workers' skin , and "joking" that it was hard to see their black faces at night.

21
Indeed, this pattern of conduct became such a regular part of the workplace that such

22
harassment was a term and condition of Plaintiff's employment, causing immeasurable

23
harm and emotional distress that persists to this day. Despite black employees' skills,

24
experience, and expertise, throughout Plaintiff's employment, they were a permanent

25
underclass treated as interlopers by Defendants.

26
20.    In addition to the above examples, Plaintiff and other black workers on

27
numerous occasions were subjected to racist chalk drawings on the bridges in the

28
railyard and on or in black workers' lockers, including but not limited to pictures of

nooses, black men hanging, monkeys with big lips, hooded KKK figures, the words "n***er" or "no n***ers" and other KKK imagery. See Exhibits A and B, which are reproductions of racist images that were in full view in the railyard and to which Plaintiff and another black engineer, who worked for the Corporate Defendants for well over a decade, were exposed, respectively. Plaintiff was subjected to seeing ropes tied in a noose hanging throughout the yard.

21.     Non-black workers pelted Plaintiff and other black workers (which was known to Plaintiff at the time) with oranges, apples, beer bottles, rocks, flares, and even urine-filled bottles with holes in them. Although Plaintiff and other black workers reported this hostile and discriminatory conduct to the Corporate Defendants' management, nothing was done about it.

22.     Non-black workers urinated or spit on portions of locomotives which they knew the black engineers, including Plaintiff, had to touch. On one occasion, two black workers entered an engine only to find a bucket of feces that someone had left for them.

23.     Defendant Flores personally participated in harassment and the creation of a hostile work environment based on race, for example, by often referring to black workers including the Plaintiff as "n***er", "lazy", "monkeys" or "you people"; and stating that black workers needed to be "spoon fed", as though they are children. Defendant Flores often engaged in racist caricatures and impressions of black people as "ghetto", directed at or in the presence of Plaintiff, such as pretending to walk like an old school seventies pimp, and miming "what's crack a lacking with you", talking about "pimps and hoes," and exclaiming "what's up my ninja!" as code for the word "n***er".

24.     Defendant Peters also personally participated in harassment and the creation of a hostile work environment based on race, directed toward or in the presence of Plaintiff, including use of "stupid a** n***ers" and "f***ing monkeys".

25.     Richard Guindon, one of the Corporate Defendants' former Trainmasters who is non-black, also engaged in a campaign of harassment against Plaintiff beginning

1  in or about 2008. For example, on or about February 17, 2009, when Plaintiff told Mr.
2  Guindon that he could not use a particular train because it was not functioning correctly,
3  Guindon became angry and said, "you f***ing blacks don't get it."

4      26.    On or about March 18, 2009, after Plaintiff was relieved of work at the end
5  of his shift and took prescribed medication, Mr. Guindon asked Plaintiff to stay on
6  because a worker from a later crew called in sick or was otherwise unable to work.
7  When Plaintiff informed Mr. Guindon that though he had taken medication, he felt he
8  could still work, Mr. Guindon became angry, yelled, and cursed at Plaintiff, and called
9  him a "stupid f***" and "stupid n***er".

10     27.    Following one of Plaintiff's earliest complaints about Mr. Guindon in or
11  about 2009, and after Plaintiff returned to work following a leave of absence, Plaintiff's
12  coworkers told him that Mr. Guindon had, during Plaintiff's leave, stated openly in the
13  workplace words to the effect of "if Lonnie Pate thinks he's been discriminated against
14  wait until he gets his a** back to work".

15     28.    On another occasion, in addressing disparate treatment, Plaintiff stated to a
16  group of managers that it appeared it him "You gotta be white to be right," and a
17  manager responded with a thumbs up.

18     29.    That open and notorious racist conduct by the Corporate Defendants'
19  employees including Defendants Flores and Peters is not only tolerated but is actually
20  reflective of the Corporate Defendants' policies and practices at the highest levels, is
21  exemplified by the conduct of Stephane Perri, formerly PHL's Superintendent and now
22  Vice President, who is non-black, and who has made racist and demeaning comments
23  toward black workers. Other examples of highly placed management directly engaging
24  in or tolerating discriminatory conduct based on race include the conduct of Elvia
25  Maciel, PHL's former Administration and Human Resources Manager who is non-
26  black, who made slave "jokes" in the presence of Plaintiff and other black workers,
27  including that "black women can handle anything because they used to be slaves", and
28  of PHL's non-black former Vice President Daniel Micklos who called a black worker a

"black sonofab**ch."

**The Corporate Defendants Subjected Plaintiff To Pretextual Discipline Up To And Including Wrongful Termination.**

30.     Black workers, including Plaintiff, routinely have been subjected to disparate terms and conditions of employment including targeting for disparate discipline, wrongful termination, and constructive discharges and demotions based on race, for which pretextual reasons are given, compared to similarly situated non-black workers who received preferential treatment. Further, during the course of Plaintiff's employment, such unfair treatment was part of a pattern and practice of the Corporate Defendants unlawfully discharging or forcing black employees to quit so as to significantly decrease the black workforce at PHL and Anacostia. This occurred not only as a result of the failure to hire or promote black workers, but also by targeting black workers for unwarranted write ups, pretextual disciplines, unfair work assignments which were more onerous or lengthy than those assigned to non-black workers, by terminating their employment based on discriminatory and pretextual reasons, or by rendering the work environment so hostile as to effectuate a constructive discharge or demotion. This conduct contributed to the hostile work environment Plaintiff experienced.

31.     For example, Defendant Flores denigrated the work performance of the Plaintiff and other black workers, such as stating he was waiting for them to f*** up", so as to find a reason to fire them, as well as threatening black workers with dire consequences if the work was not performed correctly, including pantomiming being hung by a noose. Defendant Peters has threatened black workers with taunts that if they "have an incident" which comes to his attention, he will "find them guilty." Mr. Guindon often told Plaintiff words to the effect of, "I'm going to get you." Such conduct makes clear that the Corporate Defendants intentionally and purposefully discriminated against Plaintiff. Indeed, the Corporate Defendants carried out these threats by wrongfully terminating Plaintiff, and otherwise subjecting Plaintiff and other

black workers to pretextual discipline.

32.     Plaintiff was wrongfully terminated, effective November 21, 2016, for an alleged "blind shove"—which is when engineers move a train without being able to see the back of it—for which non-black workers were not terminated but rather received a lesser penalty. In deciding to terminate Plaintiff, the Corporate Defendants treated him differently compared to at least two non-black workers involved in substantially similar incidents (i.e., blind shoves) who were not terminated.

33.     Plaintiff had an extensive history of reporting racial discrimination, harassment, and a hostile work environment at PHL and Anacostia. Not only were his complaints consistently ignored, they resulted in a target being placed on Plaintiff's back.

34.     Beginning in or about 2008 or 2009, Mr. Guindon routinely over-supervised Plaintiff, including by following the locomotive Plaintiff was operating, calling Plaintiff while he knew Plaintiff was in the midst of operating the locomotive, thereby forcing Plaintiff to stop the locomotive to answer the telephone call, and then threatening Plaintiff that he better call back later.

35.     In another example, when Plaintiff reported to a manager that someone had broken into his work locker and stolen equipment including his rule book, lantern, and radio, he was written up for being without these items of equipment.

36.     Another black worker, Rodney Williams, served in management during the time that Plaintiff worked for the Corporate Defendants. Upper management tasked Mr. Williams with implementing disparate disciplinary practices, requiring him to meet a quota of giving 20 efficiency failures to employees each month, which, on information and belief, the Corporate Defendants then provided to the Federal Railroad Administration. If a manager did not meet this quota, the manager would be written up. In management meetings, upper management made clear that it was predominantly the black employees who were the personnel "needing more attention", and the workers whom managers should target in order to meet the quota.

37.     In addition to the above, the Corporate Defendants' managers kept a "buddy list" which identified employees to focus on for write-ups, and which appeared to disproportionately include black employees. For those individuals on the "buddy list", shift managers increased the intensity of supervision and frequency of safety testing, including looking for efficiency failures such as not wearing glasses. Because the individuals targeted on the "buddy list" were tested more than others, they were marked down for more efficiency failures, which were documented in the employee's file. The "buddy list" was also ranked based on efficiency failures or incidents. Managers used this quota for efficiency failures and the "buddy list" as ways to harass and over-supervise black employees, under the guise of safety training.

38.     One example of the racially biased use of the "buddy list" and efficiency failures occurred in or about 2016, when Plaintiff arrived to work early and was eating in the breakroom. When Plaintiff went outside of the building to throw out his trash, he saw that Defendant Flores had pulled up and was chatting with a non-black on-the-clock crew that did not appear to be working. Upon seeing Plaintiff, Defendant Flores got out of his truck and stated words to the effect of, "Hey Pate, you know I'm going to have to write you up. That's an efficiency failure. You don't have your PPE [personal protective equipment] on," referring to Plaintiff's work boots etc. The on-the-clock workers that Defendant Flores was chatting with were not wearing PPE as required. Upon information and belief, Defendant Flores did not white up the non-black crew, but rather only sought to target Plaintiff and other black workers.

**The Corporate Defendants Subjected Plaintiff To A Disparate Workload.**

39.     Plaintiff and other black workers were required to work longer shifts than their similarly situated non-black counterparts. For example, managers including Defendant Flores and Mr. Guindon made Plaintiff and other black workers remain at work after their shift was complete without any justification or required them to work shifts longer than 10 hours and up to the maximum 12 hours even when there were new crews who could have done the work. At various times, black workers were required to

COMPLAINT FOR DAMAGES                    -10-

complete the work of non-black crews who were permitted to leave early even when they arrived after black workers. Despite this, Plaintiff was rarely if ever recognized for his accomplishments at work. This conduct contributed to the hostile work environment Plaintiff experienced.

40.     As another example, when a non-black worker refused to do a work assignment and was insubordinate to Defendant Flores in Plaintiff's presence, instead of reprimanding or disciplining that non-black worker, Flores required Plaintiff to complete the work assignment.

41.     For example, in or about late 2015, Defendant Flores required Plaintiff's crew to perform the work of a non-black outgoing crew that had accomplished very little. When Plaintiff complained, Defendant Flores assigned Plaintiff's crew extra work, over and above both their own workload and the workload of the outgoing crew, whose work Plaintiff's crew was required to complete.

**The Corporate Defendants Failed To Take Remedial Action In Response To Complaints Of Racial Discrimination And Harassment, And Instead Engaged in Retaliation.**

42.     The Corporate Defendants have been on notice of complaints about discrimination including disparate treatment and impact and harassment based on race for many years, during which time they completely failed to adequately address, much less prevent, discrimination including disparate treatment and impact, harassment, the continuation of a hostile work environment, and retaliation. Over the past more than ten years, numerous black employees have lodged complaints of racism with the Corporate Defendants' management, including but not limited to allegations of verbal harassment, racial epithets and slurs, and disparate treatment and discipline by its managers and employees. The Corporate Defendants took no or completely ineffective remedial or disciplinary action in response to these complaints. They Defendants failed to provide anti-discrimination and harassment training, enhanced reporting procedures or antiretaliation measures, and/or failed to effectively enforce any such training,

procedures, and measures. Throughout the course of Plaintiff's employment, the Corporate Defendants failed to investigate, discipline, remedy, or prevent discrimination, harassment, the hostile work environment, or retaliation at PHL and Anacostia. The corporate culture of extreme racist denigration by managers resulted in continuing harassment, hostile work environment, and disparate treatment and impact by new managers brought in, and in retaliation against those who lodged complaints.

*2009-2011:Plaintiff's Complaints To The DFEH And EEOC*

43.    In or about April 2010, Plaintiff filed charges with the California Department of Fair Employment and Housing ("DFEH") against the Corporate Defendants and individual non-black managers alleging harassment, hostile work environment, denial of promotion, failure to prevent discrimination or retaliation, and retaliation because he was black.

44.    On or about July 2010, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging that beginning in 2008, Mr. Guindon had subjected him to continuing racial harassment and retaliation, including but not limited to calling Plaintiff "stupid n***er" and "dumb a**", over-supervising him, and writing him up without justification, and that other managers to whom he complained did nothing. The current president of PHL was well aware of the history of complaints, having attended a conference at the EEOC in connection with Plaintiff's charge. Despite this knowledge at the highest level of PHL, the discrimination and harassment did not cease.

45.    Plaintiff repeatedly complained to other managers about Mr. Guindon. Not only did those managers do nothing, but each time he complained about Mr. Guindon, he found a write-up in his locker from Mr. Guindon immediately following the complaint.

*2014: Plaintiff's Grievance Protesting Discrimination To PHL*

46.    Despite the Corporate Defendants' inaction and Plaintiff's fears that it would be futile to complain about the ongoing racial harassment, Plaintiff continued to

stand up for his rights and those of other black workers. Specifically, on or about September 15, 2014, Plaintiff sent a written complaint to PHL, complaining about a non-black worker who harassed him and subjected him to a racially hostile work environment. The worker harassed Plaintiff with egregiously denigrating epithets and physical threats to the point that Plaintiff feared not only for his job but also his safety, including saying "It's whatever I say that goes you f***ing monkey" and "If you don't want to do what I ask you to do, then you need to find another job stupid n***er!"

47.     Despite the complaints made by Plaintiff and other black workers, the Corporate Defendants took no or completely ineffective action to remedy, discipline, or prevent the discrimination and harassment. Instead, the Corporate Defendants retaliated against and continued to harass and discriminate against Plaintiff for speaking up about the racial discrimination, harassment, and a hostile work environment, and against other workers who had done the same. Following these complaints, the severe and pervasive racial hostility remained unchanged until Plaintiff's wrongful termination.

**During 2015-2016 And Following Plaintiff's Complaints, The Corporate Defendants Escalated Their Harassment Against Plaintiff.**

48.     From about 2015 through the time of Plaintiff's wrongful termination in November 2016, Plaintiff continued to experience egregious discriminatory and retaliatory harassment meant to intimidate him. He continued to be subjected to racist epithets, including the word "n***er", on a weekly basis from Defendant Flores, among others.

49.     On one occasion in or about the spring or early summer of 2015, Plaintiff was required to complete the work of a non-black crew before beginning his assigned work. After completing the other crew's work, Plaintiff returned to the break room to find his bagged lunch left on a breakroom table. The table was covered with urine and it appeared that someone had urinated on his lunch.

50.     In or about June 2015, Plaintiff had resorted to keeping his personal items in an electrical cabinet due to his locker having been repeatedly broken into. Upon

COMPLAINT FOR DAMAGES                    -13-

going to the cabinet to retrieve his items, he found the words "black n***er" scrawled in black rail chalk on the door. The cabinet was also smeared with feces, which appeared to be human feces. Plaintiff was distraught by this hostile act.

51.     Within a week or so of the locker incident, Defendant Flores stated to Plaintiff while driving through the rail yard, "You're going to work tonight, my n***a!"

52.     Sometime after July 4, 2015, Plaintiff met with Ms. Maciel in Human Resources to discuss potentially taking leave pursuant to the Family and Medical Leave Act. During this conversation Ms. Maciel said words along the lines of "black women use to be slaves… they're strong!"

53.     In or about late 2015, while Plaintiff was washing his hands in the restroom at the terminal, Defendant Peters entered the restroom and stood beside Plaintiff facing the mirror. Defendant Peters pointed to Plaintiff in the mirror and stated, "Look! Do you see that n***er?" Plaintiff just looked at Defendant Peters and walked out of the restroom.

54.     During 2015-2016, Plaintiff was subjected to menacing and oversupervision from Defendant Flores and others. As before, managers and other non-black employees continued to refer to black workers by various racial epithets on a regular basis. It had gotten so bad that Plaintiff would become fearful and anxious when he saw a white truck that was reserved for management, that he sometimes resorted to hiding for his safety.

55.     In fact, about a few months before his wrongful termination, Plaintiff was working in the railyard one night as a white management truck approached and one of its passengers shone a bright flashlight, scanning the area. Plaintiff could not see which manager was in the truck. As the truck drove by, he heard a manager say in a sing-song voice, as though calling an animal: "Heeere, n***er, n***er, n***er!" Hearing this, Plaintiff felt hunted and feared for his life.

56.     Indeed, during the time that Plaintiff was employed by the Corporate Defendants, other black employees endured the same racially hostile work environment

and complained about the same. Because Plaintiff witnessed and/or was aware of what other black workers endured, the conduct against other black workers exacerbated Plaintiff's own hostile work environment.

57.   Additionally, after the Corporate Defendants received notice that Plaintiff and other black workers were pursuing legal action, black workers continued to be subjected to a racially hostile work environment in retaliation, including unwarranted discipline and being called racial epithets.

**The Corporate Defendants Engaged In A Pattern Of Denying Black Workers Equal Employment Opportunities By Their Failure To Hire And Promote Black Workers.**

58.   The Corporate Defendants engaged in a pattern of failing to hire or promote black workers and denying them opportunities for advancement consistent with their training. Plaintiff and other black workers suffered the humiliation of being tasked with training less qualified persons, including persons who have participated in the harassment of them, for supervisory and managerial jobs they themselves had applied and unlawfully been rejected for.

59.   For example, Plaintiff observed that when he was a conductor, other non-black workers who had less experience were promoted to engineer before him.

60.   In or about 2011, Mr. Magana openly admitted to another black employee that the Corporate Defendants' discriminatory failure to promote black workers was intentional, by stating to that black employee, "We don't hire black people as supervisors. You guys are slaves." He continued, "If you don't like it, go work at McDonald's."

61.   After being terminated by the Corporate Defendants, Plaintiff has tried to obtain other jobs in the railroad industry but has been unable to secure a comparable position. Plaintiff is informed and believes that this is due to the Corporate Defendants' refusal to offer a reference on Plaintiff's behalf or providing an unfair and appraisal of Plaintiff's work performance to other railroad employers.

62.     Because of these disparate hiring practices, very few black employees have been able to rise in the ranks within the Corporate Defendants. At present, upon information and belief, of nearly 200 employees, there are only one or two black managers. The fact that the size of the black workforce at PHL and Anacostia has significantly dwindled over the past decade or longer is evidence of the Corporate Defendants' discrimination and disparate treatment and impact toward black workers.

## **CONTINUING VIOLATIONS**

63.     The wrongful acts and omissions giving rise to the Defendants' liability in this action commenced at least in 2008, if not earlier, and continued in nature throughout the Plaintiff's employment up until his discharge. The Defendants subjected the Plaintiff to discrimination, harassment, a hostile work environment, and retaliation on the basis of his race or participation in protected activity for complaining of racism on a continuous basis. All of the examples of unlawful conduct described in this Complaint are examples only and not an exhaustive list of the unlawful conduct Defendants have subjected Plaintiff to. The Corporate Defendants tolled Plaintiff's claims from April 1, 2019 through August 1, 2021.

## **FIRST CAUSE OF ACTION**

## **RACE DISCRIMINATION**

## **(42 U.S.C. § 1981)**

## **(Plaintiff Lonnie Pate against All Defendants)**

64.     Plaintiff re-alleges and incorporates by reference paragraphs 1-63 of this Complaint as though fully set forth herein.

65.     At all times relevant to this Complaint, Plaintiff was an employee of Defendants PHL and Anacostia and member of a protected class.

66.     Plaintiff is black, African American, and/or was perceived by Defendants as such.

67.     At all times herein mentioned, 42 U.S.C. § 1981 was in full force and effect and was binding on Defendants. Under 42 U.S.C. § 1981, it is unlawful for an

1    employer to discriminate against an employee on the basis of the employee's race.

2         68.    Defendants subjected Plaintiff to disparate treatment and impact, adverse

3    employment actions, and discriminated against Plaintiff in whole or part based on his

4    race, through numerous illegal acts as described in this Complaint. Plaintiff suffered

5    adverse actions including but not limited to wrongful termination, disparate discipline

6    and workload, retaliation, and/or failure to promote. The above-described actions were

7    intentional and purposeful and were perpetrated and/or ratified by the managing agents,

8    officers, or directors of Defendants PHL and Anacostia.

9         69.    Plaintiff's race as black and/or African American was a motivating factor

10   for the Defendants' conduct against Plaintiff.

11        70.    Defendants PHL and Anacostia knew or should have known of the

12   unlawful conduct, including by their supervisors, and failed to take prompt, effective

13   remedial action.

14        71.    As a result of Defendants' conduct, Plaintiff has suffered, and continue to

15   suffer, monetary and/or economic harm. Plaintiff has also suffered, and continue to

16   suffer, severe mental anguish and emotional distress, including, but not limited to,

17   depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

18   confidence, as well as emotional pain and suffering. Plaintiff is thereby entitled to

19   compensatory damages including general and special damages in amounts to be proven

20   at trial.

21        72.    Defendants' discriminatory practice(s) were done with malice or callous or

22   reckless indifference to the Plaintiff's rights, for which Plaintiff is entitled to an award

23   of punitive damages.

24                          **SECOND CAUSE OF ACTION**

25              **HARASSMENT AND HOSTILE WORK ENVIRONMENT**

26                          **(42 U.S.C. § 1981)**

27              **(Plaintiff Lonnie Pate against All Defendants)**

28        73.    Plaintiff re-alleges and incorporates by reference paragraphs 1-63 of this

COMPLAINT FOR DAMAGES              -17-

1    Complaint as though fully set forth herein.

2        74.    At all times relevant to this Complaint, Plaintiff was an employee of

3    Defendants PHL and Anacostia and members of a protected class.

4        75.    Plaintiff is black, African American, and/or was perceived by Defendants

5    as such.

6        76.    At all times herein mentioned, 42 U.S.C. § 1981 was in full force and

7    effect and was binding on Defendants. Under 42 U.S.C. § 1981, it is unlawful for an

8    employer to subject an employee to harassment or a hostile work environment on the

9    basis of the employee's race.

10       77.    Defendants subjected Plaintiff to harassment and a hostile work

11   environment in whole or part based on their race through numerous illegal acts as

12   described in this Complaint. Plaintiff suffered adverse actions including but not limited

13   to wrongful termination, disparate discipline and workload, retaliation, and/or failure to

14   promote, all of which contributed to the hostile work environment.

15       78.    The above-described actions were perpetrated and/or ratified by the

16   managing agents, officers, or directors of Defendants PHL and Anacostia.

17       79.    Defendants' conduct was not welcomed by Plaintiff.

18       80.    Plaintiff's race as black and/or African American was a motivating factor

19   for the Defendants' conduct.

20       81.    Defendants' conduct was so severe or pervasive that reasonable person in

21   Plaintiff's position would find the work environment to be hostile, intimidating,

22   offensive, oppressive, or abusive.

23       82.    Plaintiff believed the work environment to be hostile, intimidating,

24   offensive, oppressive, or abusive as a result of Defendants' conduct.

25       83.    Defendants PHL and Anacostia knew or should have known of the

26   unlawful conduct, including by their supervisors, and failed to take prompt, effective

27   remedial action.

28       84.    As a result of Defendants' conduct, Plaintiff has suffered, and continue to

COMPLAINT FOR DAMAGES              -18-

suffer, monetary and/or economic harm. Plaintiff has also suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering. Plaintiff is thereby entitled to compensatory damages including general and special damages in amounts to be proven at trial.

85.     Defendants' discriminatory practice(s) were done with malice or callous or reckless indifference to the Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

<u>**THIRD CAUSE OF ACTION**</u>

**RETALIATION**

**(42 U.S.C. § 1981)**

**(Plaintiff Lonnie Pate against All Defendants)**

86.     Plaintiff re-alleges and incorporates by reference paragraphs 1-63 of this Complaint as though fully set forth herein.

87.     At all times relevant to this Complaint, Plaintiff was an employee of Defendants PHL and Anacostia and member of a protected class.

88.     Plaintiff is black, African American, and/or were perceived by Defendants as such.

89.     At all times herein mentioned, 42 U.S.C. § 1981 was in full force and effect and was binding on Defendants. Under 42 U.S.C. § 1981, it is unlawful for an employer to retaliate against an employee for engaging in protected activity to redress a violation of a person's right to be free from racial discrimination. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008).

90.     Plaintiff engaged in protected activity by complaining about the Defendants' wrongful conduct based on race as alleged in this Complaint. Plaintiff acted under a reasonable and good faith belief that his or someone else's right to be free from racial discrimination was violated. Plaintiff reasonably believed that various laws

COMPLAINT FOR DAMAGES            -19-

and statutes prohibiting race-based discrimination, harassment, and hostile work environment were violated including but not limited to the Fourteenth Amendment to the U.S. Constitution; California Constitution Art. I, §§ 7, 8, 31; the Unruh Act, Cal. Civ. Code §§ 51, 51.5; the Fair Employment and Housing Act, Cal. Gov. Code §§ 12940(a), (j), (k); Title VII of the Civil Rights Act, 42 U.S.C.S. § 2000e-2(a), (b); and 42 U.S.C. § 1981(a).

91.    Defendants retaliated against Plaintiff for engaging in protected activity by complaining about racial discrimination or harassment, and subjecting Plaintiff to materially adverse actions at the time or after the protected conduct took place. Plaintiff suffered adverse actions including but not limited to wrongful termination, disparate discipline, and/or failure to promote.

92.    The Plaintiff was subjected to the adverse employment actions because of his participation in protected activity.

93.    Defendants PHL and Anacostia knew or should have known of the unlawful conduct, including by their supervisors, and failed to take prompt, effective remedial action.

94.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continue to suffer, monetary and/or economic harm. Plaintiff has also suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering. Plaintiff is thereby entitled to compensatory damages including general and special damages in amounts to be proven at trial.

95.    Defendants' discriminatory practice(s) were done with malice or callous or reckless indifference to the Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

/ / /

/ / /

1

## PRAYER FOR RELIEF

2      96.     WHEREFORE, Plaintiff requests relief of the Defendants, jointly and

3  severally, as follows:

4       • For compensatory damages including general and special damages,

5         according to proof;

6       • For an award of money judgment for mental pain and anguish and severe

7         emotional distress, including medical special damages, according to proof;

8       • For punitive damages;

9       • Declaratory and injunctive relief;

10      • For attorney's fees and costs pursuant applicable law; and

11      • For such other relief allowed by law and as the Court deems proper and

12        just.

13

## DEMAND FOR JURY TRIAL

14     97.     Plaintiff hereby demand trial by jury in this action.

15

16  Dated: August 2, 2021              Respectfully Submitted,

17                                     HADSELL STORMER RENICK & DAI LLP

18

19                                     By:  ___/s/ Tanya Sukhija-Cohen_____
20                                         Dan Stormer
                                           Barbara Enloe Hadsell
21                                         Brian Olney
                                           Tanya Sukhija-Cohen
22                                     Attorneys for Plaintiff LONNIE PATE

23  Dated: August 2, 2021              MIRER MAZZOCCHI & JULIEN, PLLC

24

25                                     By:  ___/s/ Kristina Mazzocchi_____
                                           Kristina Mazzocchi
26                                         Ria Julien
27                                     Attorneys for Plaintiff LONNIE PATE

28

_____
COMPLAINT FOR DAMAGES                    -21-